Institution. Ms. Walters. Good morning, Your Honors. Second, please. This Velcro is not really taking. May it please the Court. My name is Kelly Walters. I represent Latrona Moore, who is the widow of the late former plaintiff and now deceased former plaintiff, Lamont Moore. Today we are asking the Court to overturn the District Court's decision to grant the defendant's motion for summary judgment. In this case, the District Court came to the mistaken conclusion that a reasonable jury could not find that Defendant Correctional Officer Gatewood was sufficiently unnoticed about a violent altercation that would take place between Lamont Moore and Khalil Sample, the two inmates. In fact, after his fifth warning, each of which followed an incident with Sample, Mr. Moore was attacked by Sample. Sample punched Mr. Moore with a key protruding through his fingers. The key entered Mr. Moore's eye socket and ripped it out of his head. Today the primary issue plaintiff poses is that the District Court improperly made conclusions about disputed material facts and then turned around and applied those conclusions to an The parties have provided two very different accounts of what occurred. I'm sorry? I don't know. Sorry. The parties have provided two very different accounts of what occurred. Mr. Moore has consistently stated in his testimony, in his grievances, and through his affidavits that he has warned Gatewood five times and expressed concern for his own safety, requesting to be moved across the room. Gatewood has testified that Moore never gave him any of the warnings. The parties have also differed on the severity of Mr. Moore's injury. Mr. Moore has testified that he cannot walk without the assistance of his wife or his sister, he cannot drive without special glasses, and that he has fallen 15 times after losing his balance. Now, excuse me, Ms. Wolters, at his deposition, Mr. Moore said that he did not fear Sample. He did not expect Sample to hit him, and that Sample said nothing to him to make him think that Sample was going to hit him. He literally said, I didn't see it coming. If Moore did not see it coming, how do you think Officer Gatewood would have seen it coming? Well, that comes down to the specificity of the warning that Mr. Moore gave to Gatewood. And it also comes down to reading the deposition fully within context. It's not surprising that Mr. Moore stated that he was not afraid of Mr. Sample. Mr. Moore is a man who has been institutionalized for the majority of his life and is not about to admit, as a 5'11 man, that he was scared of a man who was about 5'5 or 5'6. Additionally, when reading the deposition in its entirety, Mr. Moore stated that he didn't know Sample was going to hit him. But if we read the transcript, we find that the plaintiff didn't know that Sample's attack would actually be quite so vicious. He knew an attack or a violent altercation was coming. In fact, a full reading of that deposition transcript shows that Sample didn't even realize how vicious his attack would be. Mr. Moore turned his head, and that is why the key went into his eye. He did not intend to do that. Can you point to any specific statements that Moore made to Officer Gatewood that would indicate that he feared an attack by Sample? And we've got to set aside the affidavits and grievances and focus on Moore's own words in his sworn deposition. Because he consistently testified that he told Officer Gatewood that Sample was horsing around, splashing water, making noise, hustling around, mouthing off. But I'm wondering where he testified. Did he convey any threats or described any physical confrontations to the officer? Well, I would analogize this, Your Honor, to the Kersey case that came down after we briefed the case, July of 2023. Much like that case, the inmate in that case sued the correctional officer for failure to protect him from his cellmate. The district court granted the summary judgment, stating no reasonable juror could find that the defendant disregarded the risk. But like the unstated behavior, the nonverbal communication of plaintiffs Selmate and Kersey, a jury here could find that Khalil Sample's acts, specifically the splashing of the water, the trying to break into plaintiff's property box, causing a ruckus, making ongoing comments, were sufficient to put the defendant on notice of a threat. Well, that would be a very high threshold, it seems to me, because, you know, we're in a prison. Agreed. We are in a prison. And while we can't make prisons safe, we can prevent danger that has come to our knowledge before us. It's my understanding that the complaints that your client was making, or your client's son was making, I'm sorry, not your client's, that Lamont was making, let's put it that way to distinguish Lamont, the original plaintiff from his mother who's now litigating, he was complaining to Gatewood about general problems with young inmates, younger inmates in his vicinity in this large bunk room. As I understand it, it's a large open bunk room. These are not private cells. So there's not notice to Gatewood that this specific inmate, Sample, the ultimate assailant who committed this horrific attack, was threatening violence. It's sort of horseplay arguments or horseplay complaints and a request to be moved to the other side of the bunk room. And I don't think the evidence shows anything more specific than that. Well, I would disagree. The standard requires factual inferences. And you'll find that if you look at the timeline, it was after an incident with Sample on January, I'm sorry, June 11, 2015, that he first contacted Gatewood about his issues with Sample. And then he had an issue with Sample again on the 14th. There were no issues between the 12th and the 13th that we're aware of. One issue came on the 14th. After that, Mr. Moore went to Gatewood. Then he had another issue with Sample and his friends, whomever they might be, where Mr. Moore went to Gatewood again. What does the evidence show he complained of? Are they, my understanding is that they're all in, sort of, they're generalized complaints, not specific complaints about Sample and concern about violence from Sample. Well, generally speaking, I mean, what I would say that Mr. Moore complained of is he gave Mr. Gatewood the who, the when, the why, and the where.  What specifically did he say? What does the evidence show? Truth be known, in his deposition, he did not give a quotable statement. That's the problem. We don't have any solid evidence from which a jury could conclude that Gatewood was on notice that Sample was a violent threat to Lamont. And that these complaints were all of a highly generalized nature about other inmates in the vicinity of his bunk. Well, once again, I would respectfully disagree. I don't believe, and I believe there is precedent here, that specificity is not the end-all be-all for a failure to protect claim or a deliberate indifference standard. Additionally speaking, I think that the fact that it is an inference-based standard, and the fact that these particular complaints to Officer Gatewood came every time after he had an incident. But we don't know what their content was. That's the problem. So there's nothing from which a jury could infer that Officer Gatewood was on notice. But we actually do know what the content was. Were we to look at the grievances that Mr. Moore put in? Well, that's not what he testified to. He didn't testify to anything specific regarding Sample, his concerns about Sample, or even the other inmates. Again, I respectfully disagree. While he did not provide a verbatim statement of what he had said on June 14, 2015. Well, what did he say generally? He generally said that these guys, these young guys, Sample, well, first of all, he complained to him about Sample about the incident in the bathroom, right? That's splashing water. Yes, that's the splashing water. It's certainly not enough. It's not the crux of this by any means, yes. But then you go on to June 14, where you have Mr. Sample trying to break into Mr. Moore's property box. And he goes to Gatewood and tells him about that. Then you have Mr. Sample tussling with his friends, specifically around Mr. Moore. And Mr. Moore goes to Gatewood and tells him about that. Each time asking to be moved. Mr. Gatewood, officer, excuse me, Officer Gatewood was well aware of the fact that there was a potential for violence here. Mr. Gatewood, Officer Gatewood, excuse me, in his deposition even stated that it is his responsibility that if an inmate comes to him indicating he has some concern for his own safety, he has to move him. Officer Gatewood additionally even went to the lieutenant to see if he could move them. If Mr. Moore's deposition is to be believed, which it is at this point. You can continue. Oh, OK. Well, not to belabor it, but the district court and the defendants have manipulated the standard for failure to protect in this case. And much like the Horshall versus Casper case, have failed to recognize that jailhouse threats are rarely made with the level of detail that the district court is demanding. However, Moore provided Gatewood with the, as I said, the who, the where, the why, and the when. And I'd like to point out that most of the cases in the Seventh Circuit that have found no liability and a failure to protect claim have been because the plaintiff was not able to indicate the exact person. And here Mr. Moore did so. The only thing Mr. Moore didn't do was reach into a crystal ball and reveal the how of the attack. He was not able to tell Gatewood the viciousness of the attack. I see I'm at three minutes. I'm going to reserve. Thank you. Ms. Hanson. Good morning. May it please the court. Christina Hanson on behalf of defendants at police. Defendants were entitled summary judgment on both the eighth amendment, eighth amendment correctional center. First, as to the eighth amendment claim, Moore failed to come forward with competent evidence from which a reasonable jury could conclude that Gatewood was deliberately indifferent to a serious risk to Moore's safety. To meet his burden at summary judgment, Moore had to present sufficient evidence for a reasonable jury to find that he knew of a serious eminent risk of harm and that he failed to take any reasonable steps to abate that risk. And the summary judgment record falls far short of that standard. Moore asked Gatewood to be moved on several occasions, and he complained about young guys near his bunk horse playing or messing around. But the competent evidence in this case, which is Moore's own testimony, as well as the Brownlee affidavit, presented no evidence that Gatewood was on notice of an actual risk of harm. The couple of days before the incident, Moore testified that a couple of days before the incident, he asked to be moved to a different area. As plaintiff's counsel pointed out, it was an open dormitory. He didn't ask to be moved into protective custody. He didn't ask to be moved into a different dormitory. He asked to be moved within the same J unit that he was in, and he complained that the young guys were making noise. He couldn't get any sleep. So that was Mr. Moore's testimony. Specifically, he said, he told the officer, would you move me to the other side of the unit so I could stay away from him? There was a bunch of young guys in the area, the area I was in. He testified you basically couldn't get sleep on that side. There were a few of us older guys that were up in the unit. Those are not the kind of reports of a specific, imminent, plausible threat to somebody's safety that would put a correctional officer on notice of a serious risk to his safety. As to the day of the incident, Moore again testified that he complained about the young guys coursing around, and he asked to be moved. But again, he did not report a specific threat to his safety. In fact, his own testimony regarding his interactions with Sample, he didn't recall being threatened by Sample. He testified to two occasions, one a few days before the incident, where he said that Sample said something to him. They exchanged words. But he didn't remember what Sample said. And he testified that it was something that he, quote, brushed off or walked off. So he didn't recall a specific threat that Sample had made. And also on the morning of the incident, he testified in the same way, that Sample said something to him, but he didn't recall being threatened by Sample, and he brushed it off. So although he went to talk to Gatewood, he didn't perceive a threat. His own testimony was that he didn't perceive a threat. And so there wasn't a threat to report. Indeed, on the day of the incident, his testimony was that he didn't see it coming. He didn't expect Sample to hit him. He said, when asked if there might have been anything that alerted him to whether he would be attacked, he responded, no. If he did, this wouldn't have happened. I did not see it coming. May I ask you something about the ADA claim, please? Yes. Would you address Mr. Moore's repeated falls? It appears that his monocular condition put him off balance, causing him to bump into things, fall repeatedly. Why wouldn't that create a genuine issue on whether he was substantially impaired in walking? I understand that he didn't fall while he was at Western Illinois, but why would that be determinative if he fell repeatedly later? After his release? Well, the ADA claim is against the Department and Western Illinois Correctional Center relating to the 10-month period between August 2015 and May 2016 when he was incarcerated at Western. And his own testimony there was that he did not experience any falls there. And so the testimony later with respect to his issues with balance and the fact that he had experienced falls happened later when he was outside of the Department's custody. And so that testimony wouldn't be relevant to whether he was in need of an accommodation  or not. The Supreme Court has recognized that monocular vision is not a per se disability, that a plaintiff has to present evidence that he was substantially limited, that a physical impairment substantially limited one of his major life activities. We don't dispute that the monocular vision was a substantial impairment. The issue is whether the difficulty that he presented rose to the level of a disability. Why do we have to decide that in this case? Why do we have to decide whether, well, there are other bases on which to affirm summary judgment in this case. To begin, this is a, as I mentioned, this claim is for the 10-month period that he was incarcerated at Western. And so the only relief available to Mr., to plaintiff at this stage would be money damages which are unavailable under the 11th Amendment because there's no constitutional dimension to his claim. And so the court need not, need not address the merits of the ADA claim. But if the court does address the merits, as the district court found, Mr. Moore was not, did not have a disability under the Americans with Disabilities Act. But also he didn't, he didn't go through the proper channels of requesting the accommodation that, that he sought which was to have his housing assignment moved. As plaintiff acknowledged, he was given a slow walk permit. So there was no deliberate indifference. They acted. That's correct. There was no deliberate indifference which is necessary to show intentional discrimination to allow a claim for money damages under the ADA. And so the court may affirm on that basis as well. So if there are no other questions, we would ask that the court affirm summary judgment on both the 8th Amendment claim and the Americans with Disabilities Act claim. The sovereign immunity issue, the 11th Amendment issue wasn't litigated at summary judgment. It was preserved in your answer but not litigated. Is that right? That's correct. It wasn't litigated at the summary judgment stage. And so, but this court may excuse the forfeiture given that it's a, you know, that it's an and also to, you know, whether the court should hear the case. But it's not jurisdictional. So we don't have to address it. You don't have to address it. Thanks. Thank you. That's all. Thank you. Ms. Walters. Thank you. To address some of the claims made by my respected opposing counsel, very much disagree that the record falls short of the standard for an inference for deliberate indifference. Would I like to see more? Yes. But at this stage, a reasonable juror could see five different warnings in the same day each one after one separate incident with the same gentleman as being an inference that there is a real safety issue there. And the one thing everybody disagrees, I'm sorry, excuse me. The one thing everybody agrees on in this case is that Mr. Gatewood, Officer Gatewood did nothing after getting all five of those warnings. And the fact that opposing counsel raises the issue that Mr. Moore wanted to move across the room. He wanted to move across the room from his friends. He asked for a really reasonable remedy in this case. And once again, Officer Gatewood, despite having five warnings that day, did absolutely nothing. And I believe at this point, a reasonable jury could easily, easily find that this was deliberate indifference. There are factual inferences. Officer Gatewood knew and a reasonable jury could easily find that. Also, I'm sorry. Also, opposing counsel indicated that Mr. Moore brushed off the statements from Mr. Sample. And yes, he did indicate that he did. He didn't indicate that they were terribly threatening. He didn't remember what they were also. But if he wasn't concerned from those statements, once again, why would he have gone to Officer Gatewood? Why would Officer Gatewood have gone to the lieutenant? Well, and a jury could filter those brush off statements that he made in his deposition, attributing it to the kind of prison culture that exists. Yes. Inmates don't want to acknowledge that sort of thing. And likewise, a jury could assume that this is the reason why. Yes. So we respectfully request that this court find that a reasonable, find that a jury must hear the facts of this case because there are so many in dispute and overturn the grant of summary judgment. Thank you. Thank you. Our thanks to all counsel. The case is taken under advisement. We'll move to a